**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

**ANITA J. CRAWFORD,**

   **Plaintiff,**

**vs.**                                                          **Case No. 5:10cv222-RS/WCS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

   **Defendant.**

_____/

## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D).   It is recommended that the decision of the Commissioner be reversed and the case be remanded for further consideration.

**Procedural status of the case**

Plaintiff, Anita J. Crawford, applied for disability insurance benefits and supplemental security income benefits.  Her last date of insured status for disability benefits was December 31, 2009.  Plaintiff alleges disability due to degenerative disc

disease with back pain, obesity, hypertension, and general arthralgia, with onset on

February 13, 2007.  Plaintiff was 39 years of age on the alleged onset date, has a 12th

grade education with some college classes, and has past relevant work as a

correctional officer, housekeeper, nurse's aide, and a sewing machine operator.  The

Administrative Law Judge found that Plaintiff had the residual functional capacity to do a

full range of light work, can still do her past relevant work as a housekeeper and as a

sewing machine operator, and thus was not disabled.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by

substantial evidence in the record and premised upon correct legal principles.  Chester

v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a

scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable

person would accept as adequate to support a conclusion." Bloodsworth v. Heckler,

703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d

1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if

supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir.

2002).  "If the Commissioner's decision is supported by substantial evidence we must

affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232,

1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial

deference to the Commissioner's decision." Dyer v. Barnhart, 395 F.3d 1206, 1211

(11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to

uphold the Secretary's decision by referring only to those parts of the record which

support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.    Is the individual currently engaged in substantial gainful activity?

2.    Does the individual have any severe impairments?

3.    Does the individual have any severe impairments that meet or
       equal those listed in Appendix 1 of 20 C.F.R. Part 404?

> 4.      Does the individual have any impairments which prevent past
>          relevant work?
>
> 5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the administrative hearing**[1]

Plaintiff testified that she cannot work due to chronic pain from her neck to the

bottom of her feet.  R. 30.  She said she also cannot work due to impairment of her

knees.  *Id.*  She said that someone had told her she needs a total knee replacement.

---

[1] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at < http://www.pdrhealth.com/drugs/drugs-index.aspx >. Information about medical terms and prescription drugs come from DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS, available at:  http://www.mercksource.com (Medical Dictionary link) or MEDLINE PLUS, found at www.nlm.nih.gov/medlineplus/mplusdictionary.htm.  Social Security Rulings can be found at:  http://www.ssa.gov/OP_Home/rulings/rulfind1.html.    The pages at these websites are not attached to this report and recommendation as the information is relatively well-settled, the precise definitions are not at issue in this case, and the definitions are not likely to be in dispute.

*Id.*  She said she had spurs on the bottom of her feet, a sharp pain in her lower left side, and carpal tunnel cysts in her wrists.  *Id.*

Plaintiff said that she has to drive two and one-half hours to see her current physician, Dr. Harding.  R. 31.  She said that on some days, she cannot walk or stand on her feet due to the pain, and some days her neck hurts down the center of her spine all the way to her feet.  R. 32.  She said that on a scale of 1 to 10, she suffers pain at the level of 10 every day.  *Id.*  She said she had gone to the emergency room for pain treatment, but she had been told she could no longer get treatment at the emergency room until she pays her bill.  *Id.*

Plaintiff said she cannot do any activities around the house.  R. 33.  She just watches "a little TV" and then lies back down.  *Id.*  She said that 6 out of 7 days are "bad" days.  *Id.*  She said that her pain level while she was at the hearing was 4 and she thought that this was because she had taken her pain medication.  *Id.*  She was then taking Lyrica,[2] Celebrex 200,[3] muscle relaxers, and hydrocodone.[4]  *Id.*  She also had

---

[2] Lyrica is used in patients 18 years of age and older with nerve pain called diabetic neuropathy, postherpetic infection nerve pain, fibromyalgia (a condition in which there is widespread pain in the muscles and soft tissues surrounding the joints throughout the body), and in combination with other medications to reduce the incidence of seizures. PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[3] Celebrex is prescribed for acute pain, menstrual cramps, and the pain and inflammation of osteoarthritis, ankylosing spondylitis (rheumatoid arthritis of the spine), and rheumatoid arthritis.  It is a member of a new class of nonsteroidal anti-inflammatory drugs (NSAIDs) called COX-2 inhibitors.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[4] Hydrocodone is a semisynthetic narcotic derivative of codeine having sedative and analgesic effects more powerful than those of codeine.  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

some Oxycodone given to her by her sister.[5]  She said that the pain medications caused her to be forgetful.  R. 34.  She said that a pain pump had been recommended because she did not like being "high" on pain medications.  R. 38.  She also said she also suffers from dizziness and fainting.  R. 34.

Plaintiff thought that she could lift no more than one-half gallon of milk.  R. 34. She said she can stand only 10 minutes, sit for 20 to 30 minutes, and sleeps for only three or four hours a night.  R. 35.  She said that it takes two or three minutes to walk the 20 or 30 feet to her mailbox.  R. 36.  She said that a physician had prescribed a cane for walking, and she had used it for the prior four years.  *Id.*

Plaintiff said that she fixes her own meals, but does no housework.  R. 36.  She does her own shopping, using a motorized scooter.  R. 37.  She said her physician told her not to drive a motor vehicle.  *Id.*  She said that squatting triggers pain.  *Id.*  Plaintiff said that she wanted to work, and that if she could work, she would be making $18 an hour.  R. 38.

**Medical evidence**

On September 15, 2006, Plaintiff was treated for vertigo in the emergency room. R. 262-263.  On September 27, 2006, Plaintiff was treated in the emergency room for moderate upper leg pain.  R. 260-261.  On November 9, 2006, an x-ray of Plaintiff's right knee revealed minimal degenerative changes, that is, spur formation of the patella, but no fractures or effusions.  R. 285.  She was again treated in the emergency room on December 27, 2006, for chronic neck and back pain.  R. 264.

---

[5] Oxycodone, a narcotic analgesic, is used for its calming effect and for pain and is one of the two ingredients in Percocet.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

On March 15, 2007, Plaintiff was seen by Ahmad T. Ismail, M.D., complaining of chronic back pain.  R. 445.  A history of back and neck injury was noted.  *Id.*  The diagnostic impression was hypertension (htn) and chronic back pain (cbp).  *Id.*  Flexeril[6] and Ultram[7] were ordered.  *Id.*

Plaintiff returned to Dr. Ismail on March 29, 2007.  R. 444.  She said that pain still radiated from her upper back to her feet.  *Id.*  Dr. Ismail noted spasm in Plaintiff's upper back and her range of motion was limited.  *Id.*  His impression was upper back pain and hypertension.  *Id.*  Lortab[8] was prescribed.  *Id.*

On April 2, 2007, a chest x-ray revealed "mild anterior height loss of the T5 vertebral body, but no history of an acute injury is given."  R. 282.

On April 27, 2007, Plaintiff returned to Dr. Ismail.  R. 443.  She complained that the medications were not helping, that she had neck pain from bending over, and that the pain ran up her spine to her neck.  *Id.*  She also complained of leg pain and paresthesia.  *Id.*  On examination, Dr. Ismail noted that straight leg raising was positive for pain, Plaintiff had less range of motion of her spine, and heel and toe walking was

---

[6] Flexeril is a muscle relaxant prescribed to relieve muscle spasms resulting from injuries such as sprains, strains, or pulls.  Combined with rest and physical therapy, Flexeril provides relief of muscular stiffness and pain.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[7] Ultram (tramadol hydrochloride tablets) is a centrally acting synthetic opioid analgesic.  PHYSICIANS' DESK REFERENCE (2005).

[8] Lortab is one of the brand names for hydrocodone.  PHYSICIANS' DESK REFERENCE (2004), p. 3233.  Hydrocodone is a semisynthetic narcotic derivative of codeine having sedative and analgesic effects more powerful than those of codeine.  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

"not possible."  *Id.*  His impression was chronic back pain and knee pain.  *Id.*  Lortab and Motrin were prescribed.  *Id.*  An MRI of Plaintiff's lower spine was ordered.  *Id.*

On May 4, 2007, Plaintiff returned to Dr. Ismail with complaints of knee and neck pain; she told him that she was "just hurting all over."  R. 442.  His impression was chronic back pain and iron deficiency anemia.  *Id.*

On June 4, 2007, Plaintiff was seen again by Dr. Ismail.  R. 441.  She said that she was depressed, hurting in her lower back, and the medications were not helping.  *Id.*  His impression was chronic back pain, and Lortab was prescribed.  *Id.*

On July 19, 2007, Plaintiff had an x-ray of her lumbosacral spine.  R. 278.  This revealed minimal spondylosis, no compression fracture, and the disc spaces appeared to be fairly well maintained.  *Id.*  It was noted that a slight narrowing of the disc space at L5-S1 "cannot be excluded."  *Id.*  On the same date she was treated in the emergency room for back pain without lumbar radiculopathy.  R. 272-273.

On July 5, 2007, Plaintiff was seen again by Dr. Ismail for lower back pain.  R. 440.  There was no change in his diagnosis and Lortab was continued.  *Id.*

On July 12, 2007, Plaintiff told Dr. Ismail she was depressed, her medications were not helping, and she still hurt in her lower back.  R. 439.  She also complained of heartburn.  *Id.*

On August 1, 2007, Plaintiff told Dr. Ismail that she had upper back and neck pain, was depressed, and her back was hurting all of the time.  R. 438.  Dr. Ismail noted spasm in her upper back, but the region was "nontender."  *Id.*  Her range of motion was

limited but her gait was within normal limits.  *Id*.  Toe and heel walking were again noted to be difficult for Plaintiff.  *Id*.  He referred her to a pain clinic.  *Id*.

On August 15, 2007, Plaintiff was treated in the emergency room complaining of pain at a level of 7 out of 10.  R. 270-271.  The results of her physical examination, however, were normal.  R. 271.

On August 6, 2007, Plaintiff was examined on a consultative basis by Sam R. Banner, M.D.  R. 226.  Plaintiff complained of chronic spinal pain in all regions since an injury in a motor vehicle accident in January, 2003.  *Id*.  Dr. Banner noted that in 2004, a Dr. Maddox, a neurologist, had diagnosed Plaintiff as having degenerative disc disease of her cervical, thoracic, and lumbar spine.  *Id*.  Plaintiff told Dr. Banner that she had been told she was not a surgical candidate, and that Dr. Ismail had referred her to a pain clinic.  *Id*.  Plaintiff said she had difficulty walking, sitting, or standing for any length of time, and she complained of increased cervical spinal pain when she pushed or pulled with her upper extremities.  *Id*.  Dr. Banner noted a medical history of hypertension, depression, right knee pain, and anemia.  *Id*.  Dr. Banner said that Plaintiff was using a cane "prescribed by her physician."  R. 227.  On examination, Dr. Banner observed no spasm on range of motion testing of Plaintiff's neck or back.  R. 227-228.  He said that Plaintiff had no pain or difficulty getting on and off the table.  R. 228.  Plaintiff walked 6 to 8 steps in his office without the cane with no evidence of ataxia.[9]  *Id*.  He found that Plaintiff could do tandem heel to toe walking satisfactorily.  *Id*.  Plaintiff's muscle strength was 4 out of 5 in all extremities.  R. 229.  Plaintiff had no

---

[9] Ataxia is a failure of muscular coordination; irregularity of muscular action.  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

atrophy of her muscles and her muscle tone was normal.  *Id.*  Her sensation to pinprick was intact in all extremities.  *Id.*  The seated straight leg raising test was observed to cause neck pain bilaterally.  *Id.*  Plaintiff's fine and gross motions of both hands were satisfactory, and she was able to button and unbutton clothing without difficulty.  *Id.*  Dr. Banner's diagnosis was degenerative disc disease of her cervical, lumbar, and thoracic spine by history, hypertension, depression, chronic right knee pain by history, and a prior dislocated right shoulder.  *Id.*  He said that Plaintiff will continue to need medical care.  *Id.*

On August 21, 2007, Plaintiff was examined on a consultative basis by George L. Horvat, Ph.D., for a determination of her mental status.  R. 240.  Dr. Horvat said that Plaintiff walked slowly with a cane and "she appeared to be in pain."  *Id.*  She was five feet, ten inches, tall and weighed 230 pounds.  *Id.*  She complained of depression and back, neck, shoulder, left arm, and knee pain.  *Id.*  Plaintiff said that she had been in a 2003 motor vehicle accident in which she hit her head on the windshield.  R. 241.  She said each day she cooks her own breakfast and then lies down and watches television.  *Id.*  Plaintiff reported that she cannot go to sleep until 3:00 a.m. and awakes at 6:00 a.m.  *Id.*  She said that her medication was not helping her pain, that she frequently cries, and had lost interest in most things.  *Id.*  Plaintiff said that she was terminated from her correctional officer job because she could not perform her duties.  *Id.*  Her current pain medications were Ibuprofen, Celebrex,[10] Tramadol,[11] and Cyclobenzaprine.[12]   Dr.

---

[10] Celebrex is prescribed for acute pain, menstrual cramps, and the pain and inflammation of osteoarthritis, ankylosing spondylitis (rheumatoid arthritis of the spine), and rheumatoid arthritis.  It is a member of a new class of nonsteroidal anti-inflammatory drugs (NSAIDs) called COX-2 inhibitors.  PDRhealth™, PHYSICIANS'

Horvat said that Plaintiff used a cane and her gait was stopped [sic, probably stooped]. R. 242.  Her mood and affect were depressed, and she was preoccupied with pain.  *Id.* He found that "[h]er abstraction was concrete, her judgment was commonsensical, her reality testing was distorted, her insight was nil, and her decision making was normal." *Id.*  Illness was her main stressor, and he noted that "her coping ability is exhausted." *Id.*  Dr. Horvat said: "Her skill deficits are in the areas of intellect, education, and activities of daily living, and the service system is her main support."  *Id.*  She isolated herself socially due to her illness.  *Id.*  Plaintiff thought that she was impaired because she could not sit for long and needed a can to walk.  *Id.*  Dr. Horvat's diagnosis was major depressive disorder, current, and pain disorder.  *Id.*  He concluded: "If the claimant can be cleared physically to return to work, there are no psychological reasons why she cannot do so.  Her psychological treatment program can be scheduled around her work commitments."  R. 243.

On August 23, 2007, Dr. Ismail again saw Plaintiff.  R. 437.  She complained of back pain, but had no paresthesia or weakness of her extremities.  *Id.*  He prescribed Lortab.  *Id.*

On September 24, 2007, Plaintiff was treated in the emergency room for an exacerbation of chronic back pain.  R. 268-269.  The pain was described as at the level

---

DESKTOP REFERENCE.

[11] Tramadol hydrocholoride is marketed as Ultram, a centrally acting synthetic opioid analgesic.   PHYSICIANS' DESK REFERENCE (2005).

[12] Cyclobenzaprine is a muscle relaxant.  Brand names are Amrix and Flexeril. MEDLINE PLUS (MERRIAM-WEBSTER).

of 9 or 10.  R. 268.  She was tender to palpation in her lumbar back.  R. 269.  Toradol[13] and Lortab were prescribed.  *Id*.

On October 19, 2007, Plaintiff was seen by the Jackson Hospital emergency room for inability to urinate.  R. 275-276.

On October 23, 2007, Plaintiff was treated in the Donalsonville Hospital emergency room complaining of back pain that she said she had had for the prior 27 years.  R. 289.  She denied any change in pain due to recent trauma.  *Id*.  She said the pain was worse with ambulation.  *Id*.  The diagnosis was lumbosacral back pain.  *Id*.

On December 16, 2007, Plaintiff was treated again in an emergency room.  R. 287.  She complained of constant pain at level 10 in her foot, ankle, leg knee, thigh, and hip, but not her back.  *Id*.  She said the pain had started three days earlier.  *Id*.  Her back and neck were determined to be within normal limits on examination.  R. 388.  The straight leg raising test, however, localized the symptoms to the back and caused pain to radiate down the leg.  R. 388.  An x-ray of Plaintiff's lumbar spine revealed only mild multi-level degenerative changes, but no acute process.  R. 395.  She was prescribed Toradol and Pecid (for stomach pain).  R. 390.  After a few hours, she was discharged "pain free."  R. 391.

---

[13] Toradol is a nonsteroidal anti-inflammatory (NSAID) drug.  It is "indicated for short-term (up to 5 days in adults) management of moderately severe acute pain that requires analgesia at the opioid level.  It is NOT indicated for minor or chronic painful conditions."  PHYSICIANS' DESK REFERENCE (2004), p. 2966.

On April 2, 2008, Plaintiff was treated in the emergency room of Tallahassee Memorial Hospital.  R. 341-359.  She complained of an acute exacerbation of chronic back pain for the prior seven days, and she was given Percocet.[14]  R. 342, 346, 349.

On May 31, 2008, Plaintiff was treated in the emergency room for moderate chronic back pain.  R. 424.  She said that she was out of Lortab and needed a refill.  R. 428.  She had overslept and missed her pain management appointment that day.  *Id*. She was given Toradol.  R. 426.  Plaintiff was wheeled into the emergency room initially.  R. 425.  When she was given her discharge papers, she refused to sign and screamed: "I want my Lortab."  *Id*.  It was noted that Plaintiff "stormed" out without a limp and without any difficulty.  *Id*.

On June 5, 2008, Plaintiff was treated again in the emergency room.  R. 364-379. She was medicated to decrease pain.  R. 379.  Her medications then included Demerol,[15] Phenergan,[16] Toradol, and Soma.[17]  R. 378.

---

[14] Percocet, a narcotic analgesic, is used to treat moderate to moderately severe pain.  It contains two drugs – acetaminophen and oxycodone.  Acetaminophen is used to reduce both pain and fever.  Oxycodone, a narcotic analgesic, is used for its calming effect and for pain.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[15] Demerol is a narcotic pain medication used for the relief of mild to moderate pain. PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[16] Phenergan is a trademark for preparations of  hydrochloride of promethazine. MEDLINE PLUS (MERRIAM-WEBSTER).

[17] Soma is used, along with rest, physical therapy, and other measures, for the relief of acute, painful muscle strains and spasms.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

On August 10, 2008, Plaintiff was seen by the Jackson Hospital emergency room.  R. 417-421.  She complained of pain "all over her back."  R. 417.  Her medication then was Lortab and Celebrex.  R. 420.  The pain had existed for the past two days.  R. 421.  Toradol was given.  R. 423.

On August 11, 2008, Plaintiff was seen for an initial visit by G. Barry Taylor, M.D. R. 457-458.  She complained of pain from her neck to the bottom of her feet, with muscle aches, numbness, and a burning sensation accompanied by bilateral carpal tunnel syndrome.  R. 457.  She said that her pain had been present for the last four years.  *Id.*  She said that her pain was not responding well to Lortab and Celebrex.  *Id.* Dr. Taylor's assessment was hypertension, markedly elevated, generalized myalgia, consider fibromyalgia, peripheral neuropathy, bilateral carpal tunnel syndrome, and GERD.  R. 458.  He advised Plaintiff to wear a wrist brace at night and during the day for the first two weeks.  *Id.*

On August 25, 2008, Plaintiff was seen by Susan Harding, M.D.  R. 432-435. While there was a place to indicate (by either a check mark, for normal, or an "x," for abnormal) whether Dr. Harding found Plaintiff's "back, including spine," to be either normal or abnormal, Dr. Harding made no notation on the form.  R. 433.

On what appears to be October 7, 2008,[18] Dr. Harding filled out a form entitled "Clinical Assessment of Pain."  R. 453.  She circled the paragraph that said that "pain is

---

[18] The year is difficult to read, but the date clearly is in October and seems to be the 7th of that month.  This form is included among records from Dr. Harding submitted by Plaintiff on June 29, 2009.  R. 446.  The forms are in chronological order, with the last first.  The form that precedes this assessment is dated October 13, 2008.  R. 452. Thus, the year of this medical assessment must be 2008, and it is probably the 7th day, which precedes October 13th.

present to such an extent as to be distracting to adequate performance of daily activities or work." *Id.* She said that physical activity, such as walking, standing, and sitting, would "greatly" increase pain "to such a degree as to cause distraction from tasks or total abandonment of task." *Id.* She said that medication would pose some limitations for Plaintiff, "but not to such a degree as to create serious problems in most instances." *Id.*

Plaintiff returned to Dr. Harding on October 13, 2008, complaining of intense back pain and neuropathic extremity pain which she attributed to a motor vehicle accident in 2003. R. 452. Pain over the lumbar region was reported. *Id.* Plaintiff said she had been prescribed analgesic patches, but could not afford them. *Id.* She had gone to the emergency room for medication, and Vicodin[19] had helped. *Id.* On the form, Dr. Harding placed a check mark for "back, including spine," indicating normal findings from her examination of that region. *Id.* However, Dr. Harding also noted that Plaintiff had pain in the L1-L4 region, had intervetebral spasm, and had a bulging disc. *Id.*

On November 10, 2008, Plaintiff returned to Dr. Harding complaining of pain and "passing out." R. 451. Dr. Harding's diagnosis was back pain and hypertension. *Id.* Dr. Harding made no mark indicating abnormality for "back, including spine." *Id.*

On December 22, 2008, Plaintiff told Dr. Harding that she had extreme lower back pain with neuropathy down both legs. R. 450. Plaintiff said that her medications

---

[19] Vicodin is a brand name for hydrocodone. Hydrocodone is a semisynthetic narcotic derivative of codeine having sedative and analgesic effects more powerful than those of codeine. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

were not helping.  *Id.*  She had tenderness in the L-4, L-5, S-1 region.  *Id.*  Dr. Harding's

diagnosis was back pain and hypertension.  *Id.*  She placed an "x" for "back, including

spine," indicating abnormal findings.  *Id.*

On February 9, 2009, Plaintiff returned to Dr. Harding for refills of her

medications.  R. 449.  Dr. Harding's diagnosis remained the same.  *Id.*  There was no

mark indicating abnormality for "back, including spine."  *Id.*

On March 16, 2009, Plaintiff complained that oxycodone had not worked

because it made her blood pressure and heart rate increase.  R. 448.  Dr. Harding's

diagnosis remained the same.  *Id.*  There was no mark for "back, including spine."  *Id.*

On April 13, 2009, Dr. Harding again saw Plaintiff and again said she had back

pain and hypertension.  R. 447.  She placed a check mark for "back, including spine"

indicating that her findings from examination of Plaintiff's back, including her spine, were

normal.  *Id.*

On June 4, 2010, Plaintiff had an MRI of her lumbar spine.  R. 455.  The results

were compared with a March 22, 2008, x-ray, which showed "mild hypertrophic

changes, but no fracture or luxation, and no spondylolisthesis.  *Id.*  The MRI revealed

severe protrusion of the L3-L4 disc, "which seems somewhat reduced in height," and

moderate protrusion of the L4-L5 disc, and very little protrusion of the L2-L3 and L5-S1

discs.  *Id.*  There was good hydration of the thoracic and lumbar intervertebral discs

above L3.  *Id.*  At L3-L4, "the disc protrusion is severe and there is also considerable

hypertrophy of the ligamenta flava, reducing the cross-sectional area and

amteroposterior diameter of the spinal canal."  It was thought that there "may be slight

impingement of the nerve roots at this level, more on the left than the right, but clinical

correlation is suggested regarding the possibility of radiculopathy." *Id.* There was also

a "bulging of the disc" at L4-L5, and it was noted that there was the possibility of nerve

root compression proximally. *Id.* The conclusion was lumbar spondylosis, with mild to

moderate desiccation of the L3 through S1 discs, with the most severe protrusion at L2-

L3, but the most suspicious symptom was at L4-L5, with the possibility of nerve root

compression. *Id.* There was also the possibility of nerve root impingement at L3-L4,

especially on the left side. R. 455-456.

**Legal analysis**

> **Whether the ALJ erred in failing to give substantial weight to the opinion of Dr. Harding, Plaintiff's treating physician**

Plaintiff argues that the ALJ failed to articulate reasons supported by substantial

evidence in the record to fail to give substantial weight to the opinion of the treating

physician, Dr. Harding, and that this was error. Doc. 9, pp. 13-21.

The opinion of a claimant's treating physician must be accorded considerable

weight by the Commissioner unless good cause is shown to the contrary. Lewis v.

Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Winschel v. Commissioner of Social

Sec., 631 F.3d 1176, 1179 (11th Cir. 2011). The reasons for giving little weight to the

opinion of a treating physician must be supported by substantial evidence, Marbury v.

Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated. Phillips v.

Barnhart, 357 F.3d 1232, 1241 (11th Cir. 2004). "The Secretary must specify what

weight is given to a treating physician's opinion and any reason for giving it no weight,

and failure to do so is reversible error."  MacGregor v. Bowen, 786 F.2d 1050, 1053

(11th Cir. 1986).

The Administrative Law Judge hear set forth a very thorough review of the

medical evidence and Plaintiff's testimony, R. 18-22, but when it came time to discuss

the weight to be given to the opinion of Dr. Harding, the ALJ did not mention any of this

evidence.  He simply said that Dr. Harding's opinion "is not entitled to controlling or

substantial weight because it is not well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is inconsistent with the reports from other sources

who have examined the claimant."  R. 23.  He then relied upon the opinions of the state

agency non-examining physicians, who only reviewed the records.  Id.

These two statements are inadequate to support the conclusion that the opinion

of Dr. Harding is not entitled to receive great weight.  The first does not articulate

specific reasons supported by specific substantial evidence in the record.  Had the ALJ

correlated the medical evidence upon which he relied to his determination to discount

the opinion of Dr. Harding, this court would have something to review.  As it stands, it

does not.

The second is equally inadequate.  The opinion of a non-examining physician is

"entitled to little weight and taken alone does not constitute substantial evidence to

support an administrative decision."  Swindle v. Sullivan, 914 F.2d 222, 226 n.3 (11th

Cir.1990), citing, Broughton v. Heckler, 776 F.2d 960, 962 (11th Cir.1985).

Defendant has belatedly attempted to articulate reasons for discounting the

opinion of Dr. Harding.  Doc. 12, pp. 16-20.  On administrative review of an action of an

agency of the Executive Branch, this court may not "substitute counsel's *post hoc*

rationale for the reasoning supplied by the" agency itself.  N.L.R.B. v. Kentucky River

Community Care, Inc., 532 U.S. 706, 715 n.1, 121 S.Ct. 1861, 1868 n.1, 149 L.Ed.2d

939 (2001), *quoting*, N.L.R.B. v. Yeshiva Univ., 444 U.S. 672, 685, n. 22, 100 S.Ct. 856,

63 L.Ed.2d 115 (1980) (citing Securities and Exchange Commission v. Chenery Corp.,

332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)[20]); Real v. Simon, 514

F.2d 738, 739 (5th Cir. 1975) (denying rehearing of Real v. Simon, 510 F.2d 557 (5th

Cir. 1975)); Golembiewski v. Barnhart, 322 F.3d 912, 916 (7th Cir. 2003); Fargnoli v.

Massanari, 247 F.3d 34, 44 n. 7 (3d Cir. 2001).  However,

> While we may not supply a reasoned basis for the agency's action that the
> agency itself has not given [citing Chenery Corp.], we will uphold a
> decision of less than ideal clarity if the agency's path may reasonably be
> discerned.

Manasota-88, Inc. v. Thomas, 799 F.2d 687, 691 (11th Cir. 1986).  The ALJ's reasoning

may not reasonably be discerned here.  This court should not attempt a *de novo*

analysis as suggested by Defendant in the memorandum.

---

[20] Chenery Corp. held:

> When the case was first here, we emphasized a simple but fundamental
> rule of administrative law.  That rule is to the effect that a reviewing court,
> in dealing with a determination or judgment which an administrative
> agency alone is authorized to make, must judge the propriety of such
> action solely by the grounds invoked by the agency.  If those grounds are
> inadequate or improper, the court is powerless to affirm the administrative
> action by substituting what it considers to be a more adequate or proper
> basis.  To do so would propel the court into the domain which Congress
> has set aside exclusively for the administrative agency.

Chenery Corp., 332 U.S. at 196, 67 S.Ct. at 1577.

This, then, necessitates consideration of the remedy.  It has long been the rule in this circuit that:  "Where the Secretary has ignored *or* failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true." MacGregor, 786 F.2d at 1053 (emphasis added); Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1217 (11th Cir. 1991); Critchfield v. Astrue, 2009 WL 635698 (N.D. Fla. Mar 10, 2009) (No. 308cv32-RV/MD); Cole v. Barnhart, 436 F.Supp.2d 1239 (N.D. Ala. 2006) (finding that the opinions of the treating physician must be accepted as true where the ALJ "did not properly refute them" but did not ignore them).

But there is now some doubt as to whether that is the proper procedure.  In Winschel, *supra*, the court said:

> The ALJ did not mention the treating physician's medical opinion, let alone give it "considerable weight."  Likewise, the ALJ did not discuss pertinent elements of the examining physician's medical opinion, and the ALJ's conclusions suggest that those elements were not considered.  It is possible that the ALJ considered and rejected these two medical opinions, but without clearly articulated grounds for such a rejection, we cannot determine whether the ALJ's conclusions were rational and supported by substantial evidence.

631 F.3d at 1179.  The court remanded to correct this error.  *Id.*

In Harris v. Astrue, 546 F.Supp.2d 1267 (N.D. Fla. 2008) (No. 5:07cv44-RS/EMT), the court likewise remanded, not because the ALJ had failed to mention or discuss the treating physician's opinion, but because the ALJ gave improper reasons to discount the opinion of a treating physician (did not refute it).  Unlike Winschel, however, the ALJ did not ignore it.  Harris distinguished MacGregor as a case where the ALJ made no finding as to the weight of the opinion of the ALJ, *i.e.*, he *ignored* the opinion.  786 F.Supp.2d at 1282.  In Norman v. Commissioner of Social Sec., 2011 WL

824802, *2 (M.D. Fla. Feb. 14, 2011) (No. 6:09-CV-1594-ORL-31), *Report and*

*Recommendation Adopted by* 2011 WL 825623 (M.D. Fla. Mar. 3, 2011), where the ALJ

failed to follow this circuit's rules for evaluating a treating physician's opinion, remand

was recommended because the evidence did not establish "disability beyond doubt" or

that the claimant had "suffered an injustice."  Citing Winschel, the court said that "the

weight to be given such evidence is for the ALJ to determine, not the Court."  *Id.*, at *12,

n. 11.  To like effect is Herrera v. Astrue, 2011 WL 816797 (M.D. Fla. Mar. 2, 2011) (No.

3:10-CV-00293-J-JBT) (remanding).

It is difficult to discern a clear rule among these cases.  Nonetheless, a remand is

recommended here.  The ALJ should have the opportunity to set forth his specific

reasons for discounting the opinion of Dr. Harding.

### Whether the ALJ articulated reasons supported by substantial evidence in the record to discount Plaintiff's pain testimony

Plaintiff contends that the ALJ did not give adequate reasons supported by

substantial evidence to disbelieve her testimony as to the pain she experiences.  Doc.

9, pp. 21-24.  Pain and other symptoms reasonably attributed to a medically

determinable impairment are relevant evidence for determining residual functional

capacity.  Social Security Ruling 96-8p, p. 4.  Pain and other symptoms may affect

either exertional or non-exertional capacity, or both.  *Id.*, p. 6.

> In order to establish a disability based on testimony of pain and other
> symptoms, the claimant must satisfy two parts of a three-part test
> showing:  (1) evidence of an underlying medical condition; and (2) either
> (a) objective medical evidence confirming the severity of the alleged pain;
> or (b) that the objectively determined medical condition can reasonably be
> expected to give rise to the claimed pain.  *See Holt v. Sullivan*, 921 F.2d
> 1221, 1223 (11th Cir. 1991).  If the ALJ discredits subjective testimony, he

must articulate explicit and adequate reasons for doing so.  *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).  Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true.  *See Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).  The reasons articulated by

the ALJ for disregarding the claimant's subjective testimony must be based upon

substantial evidence.  Jones v. Department of Health and Human Services, 941 F.2d

1529, 1532 (11th Cir. 1991).

> As to Plaintiff's credibility, the ALJ said:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

R. 21.  This sentence, which so often appears in administrative opinions, is only the

conclusion.  But the conclusion is not enough.  As with the analysis of the opinion of a

treating physician, the ALJ must articulate a basis for the credibility conclusion as

required by Eleventh Circuit caselaw.

The ALJ discounted Plaintiff's testimony as to pain from carpal tunnel syndrome,

finding that there are no medical records to show that she has the medically

determinable impairment of carpal tunnel syndrome.  R. 21.  Plaintiff's counsel, Walter

Blackeney, acknowledged at the hearing on July 7, 2009, that he was not aware of any

such medical records.  He said:  "No, Judge, I don't see anything in the record regarding

the carpal tunnel."  R. 31.  This was a misstatement by counsel.  On June 29, 2009, the

same attorney, Mr. Blakeney, on Plaintiff's behalf, submitted additional medical records

to the Office of Disability Adjudication and Review. R. 446. These were available to the ALJ in time for the hearing on July 7, 2009, and when he rendered his August 14, 2009, opinion. R. 25. Among these records was the August 11, 2008, visit to Dr. Taylor. R. 457-458. Defendant argues that this was not presented to the ALJ, doc. 12, pp. 14-15, but it seems to me that it was. Defendant also argues that Dr. Taylor's assessment of carpal tunnel syndrome is not worthy of reliance because it was based entirely on Plaintiff's subjective report, and lacked "medical" evidence. Doc. 12, p. 15. The ALJ should do this analysis, however. Since the case must be remanded for other reasons, the ALJ should in the first instance consider the August 11, 2008, record from Dr. Taylor regarding carpal tunnel syndrome.

The ALJ also discounted Plaintiff's testimony that she needed a knee replacement. R. 21. He reasoned that the record did not contain any medical diagnosis to support the need for a total knee replacement. *Id.* This is supported by the record, that is, an absence of any such medical evidence. This is some evidence that Plaintiff may have exaggerated the extent of her knee problems.

The ALJ also noted that Plaintiff said that she had gone to emergency rooms when her neck and back pain got severe, but claimed that she could no longer obtain such treatment until she pays her bill. R. 21. The ALJ discounted that testimony noting that Plaintiff had been seen repeatedly in emergency rooms in Alabama, Georgia, and Florida. This determination is supported by substantial evidence in the record, and is another adequate reason to discount her testimony.

The ALJ also found that the "diagnostic studies and other objective evidence simply do not support the claimant's allegations of severe, debilitating pain."  R. 22. This is the critical point for analysis, and unfortunately, as with the opinion of Dr. Harding, the ALJ did mention the specific studies or evidence he had in mind when he wrote this.  Likewise, the ALJ discounted Plaintiff's pain testimony, finding that the record did not contain an opinion from a treating physician "indicating the claimant was disabled or had limitations greater than those determined in this decision."  R. 23.  This basis to discount Plaintiff's pain testimony depends on the propriety of rejection of Dr. Harding's opinion.  Since the case must be remanded to more thoroughly discuss Dr. Harding's opinion, the issues identified in this paragraph should also be reconsidered.  If the ALJ discount's Plaintiff's testimony due to the medical evidence, he should identify the specific medical evidence to support that conclusion.

The court is left with two aspect of the analysis of Plaintiff's pain testimony (that she said she had been told she needed a knee replacement and that she said emergency rooms would not treat her because she had not paid her bill) which erode her credibility and which have support in the record, but there are major gaps in the articulation of the analysis.  Since a remand is needed to provide reasons with respect to the opinion of Dr. Harding, a remand will also afford an opportunity for the ALJ to augment his evaluation of Plaintiff's credibility.

### Whether the ALJ adequately considered Plaintiff's obesity

Plaintiff argues that the ALJ erred by ignoring her obesity and by failing to consider the resulting limitations.  Doc. 9, pp. 26-28.  This argument is rejected.  The

ALJ cited SSR 02-01p, and noted that Plaintiff was obese, weighing 235 pounds with a height of 68 inches.  R. 18.  He did not further consider obesity, however, finding that "no treating physician has indicated she had any significant limitations" caused by obesity.  *Id.*  Plaintiff has not pointed to any evidence in the record to the contrary.  The ALJ properly considered the effects of Plaintiff's obesity upon her residual functional capacity.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge did not correctly follow the law as discuss above.  The decision of the Commissioner to deny Plaintiff's application for benefits should be reversed and remanded so that the ALJ may articulate specific reasons with respect to the weight to be given the opinion of Dr. Harding, a treating physician, and articulate specific reasons to credit or discount Plaintiff's pain testimony.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **REVERSED** and the case be **REMANDED** for the purposes set forth above..

**IN CHAMBERS** at Tallahassee, Florida, on June 13, 2011.

**s/    William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**